IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MARGARETTE J. HOOD                                                                          PETITIONER

      v.                              CIVIL NO.        5:09-CV-05007-JRM

MICHAEL J. ASTRUE,
Commissioner of Social Security                                                          RESPONDENT

**<u>MEMORANDUM OPINION</u>**

      Plaintiff brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

**I.     Procedural Background:**

      Plaintiff protectively filed for disability insurance benefits (DIB) and supplemental security income (SSI) under Title II and Title XVI of the Act on September 26, 2006, alleging disability due to a knee injury since February 13, 2006 (Tr. 79-81, 84-86, 128). The Commissioner denied Plaintiff's applications initially and on reconsideration (Tr. 45-50, 53-56).

      An ALJ held a de novo hearing on February 26, 2008, at which Plaintiff, Plaintiff's sister, and a vocational expert appeared and testified (Tr. 18-40). Attorney Frederick Spencer represented Plaintiff at the hearing (Tr. 18-40).

On July 25, 2008, the ALJ rendered a decision finding Plaintiff not disabled because she could perform her past relevant work as a convenience store cashier (Tr. 6-15). When the Appeals Council concluded on October 31, 2008, that no basis existed for review of the ALJ's decision, the ALJ's decision became the final decision of the Commissioner (Tr. 1-3).

## II.     Applicable Law:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III. Applicable Facts:**

Plaintiff is a 35 year old woman with a 9th Grade education. She is marginally literate, stating that she basically got through ninth grade without ever really knowing how to read. (Tr. 25) She has tried unsuccessfully three different times to earn her G.E.D. (i.e. General Equivalent (to a high school) Degree) - once with the assistance of a tutor - and still failed to pass this basic skills test. She reads at a very low level of educational achievement.(Id).

After completing the 9th grade, Plaintiff engaged in steady employment for 16 years primarily as a cashier at various convenient stores. (Tr. 129). During this period she also

performed labor at some fast food restaurants as well as two different times employed at a Tyson Foods plant. (Tr. 146).

On January 19, 2006 the Plaintiff was the front seat passenger in a motor vehicle accident. It appears the car was traveling at a speed greater than 55 miles per hour when it came to a sudden stop.  The plaintiff was belted in and the air bags did deploy.  (Tr. 243).  The Plaintiff presented to the North Arkansas Regional Medical Center on January 22, 2006 complaining of pain in the lower ribs.  There was no history to suggest any head injury and no lacerations or wounds were noted over the neck. (Tr. 243).  The Plaintiff denied that she had any neck or back pain. (Tr. 244). There was no reported change in hearing or vision  (Tr. 245) and the all xrays were normal. (Tr. 246).  The Plaintiff was discharged and excused from work for two days. (Tr. 247).

Plaintiff slipped and fell at work and injured her left ankle and knee.  She denied any loss of consciousness.  (Tr. 240).  She was taken to NARMC and treated and the hospital notes state "no history to suggest any head injury" and she was diagnosed with a left ankle sprain and left knee contusion and sprain. (Tr. 234).  The xrays were negative and the Plaintiff was prescribed percoset for pain (Tr. 235) and given a knee immobilizer and crutches. (Tr. 234).  She was excused from work for 3 days. (Tr. 237).

It appears that the Plaintiff then began to see Dr. Sammy Scroggins for her knee and ankle problem and Dr. Scroggins made a number of notes concerning the Plaintiff's office visits from February 13, 2006 to March 7, 2007 and ultimately referred the Plaintiff for an MRI. (Tr. 190-194).

On March 7, 2006 an MRI of the left knee was performed.  Dr. Bennett determined that

there was a large popliteal cyst present but no meniscal tear and no joint effusion was identified. (Tr. 189). Dr. Scroggins ultimately referred the Plaintiff to Dr. Sites an orthopedist.

The Plaintiff was seen be Dr. Sites on March 22, 2008 who noted that the Plaintiff was tender at all areas of the knee but that she had good straight leg raise and there was no real effusion or evident mass effect and that distally there were normal peripheral pulse, motor, and sensory exams.  Dr. Sites suggested outpatient therapy, changed her medication to Naprosyn 500 mg b.i.d[1]. and allowed her to return to light work.  He suggested a review in three weeks and if unimproved she would be a candidate for arthroscopy. (Tr.  186).

The Plaintiff did return to see Dr. Sites on April 19, 2006 and noted that the medication had helped some but she still had mild patellofemoral crepitation, with trace knee effusion.  The Plaintiff had been in therapy but was still having pain and Dr. Sites felt that, given her persistency of symptoms, she was a candidate for outpatient arthroscopy.  (Tr. 185).

On May 15, 2006 the Plaintiff did present to Dr. B. Raye Mitchell with Ozark Orthopaedic & Sports Medicine Clinic in Fayetteville, Arkansas and stated that she had done the physical therapy and felt it made the knee worse.  Dr. Mitchell noted a horizontal cleavage tear that was visible only on her coronal oriented images and only on two shots.  He was not sure if the tear extended to the surface of the meniscus.  He also noted that hip rotation was not tender and the straight leg raise was negative and sciatic tension testing was negative. The Plaintiff wanted him to scope the knee and he felt it was reasonable to do so even though conservative care had been good. (Tr. 272).

---

[1]Naproxen is a nonsteroidal anti-inflammatory drug with analgesic and antipyretic properties.

Dr. Mitchell performed arthroscopy on the plaintiff's left knee on May 26, 2006 and noted that the entire area of meniscus which is excised back to stable cartilage into the level of the tear with 4.5 smooth resectors straight and curved and smoothed with a 4.5 smooth resector mechanical.  The entire area was reprobed and the torn portion has been removed along with the cystic portion with which it is involved.  He rechecked the joint and saw no new pathology.  Recovery appeared to go well.  (Tr. 274-275).

On June 1, 2006 the Plaintiff presented to the NARMC complaining of being dizzy.  She listed her recent surgery but list her pain level at 0/10.  The physical exam noted that there was no extremity tenderness with a full range of motion in all extremities.  There was no edema and the left knee was healing well with no evidence of infection. (Tr. 227-228).

Dr. Mitchell saw the Plaintiff again on June 7, 2006 and noted that the Plaintiff was getting off her crutches, that her range of motion was good from full extension to 100 of flexion and that she walked fairly well around the office but she was a little sore.  Dr. Mitchell release her to go back to work on June 13, 2006 without restrictions.  (Tr. 271).

On June 29, 2006 the Plaintiff presented to the North Arkansas Regional Medical Center complaining that she had re-injured her leg at work when she bent her knee and felt a "pop".  The treating doctor noted that there was pain and swelling over the anterior portion of the left knee and that there was a mild to moderate joint effusion over the left anterior knee.  The rest of the knee exam was OK.  No acute instability or subluxation was noted.  The distal neurovascular exam was OK with good Dorsalis pedis and grossly intact sensory exam. The Plaintiff was offered a pain shot but declined. She was discharged and instructed to see her primary care

physician Dr. Mitchell. The Plaintiff was on vicodin[2] at the time. (Tr. 224).

On July 12, 2006 the Plaintiff presented to Dr. Mitchell who noted that the Plaintiff had a full range of motion and a negative McMurryay's test. Her joint lines were not tender and the only area she was tender was discretely along her patella and extensor mechanism. She could do unassisted straight leg raise with no lag and he did not feel any voids. He did not note any patellar instability and her IPV indicated that her patella was well seated in a nice deep trochlear groove. Dr. Mitchell felt she would improve with time and that she was doing pretty well. (Tr. 270).

On August 5, 2006 the Plaintiff presented to the Washington Regional Medical Center with a complaint of left knee pain after surgery. The physical exam revealed no erythema or warmth. The range of motion was limited due to pain. Mild effusion was present but sens and pulses were intact. (Tr. 196-197).

On August 7, 2006 the Plaintiff presented to the NARMC complaining of headache and eye pain. She listed her pain level at 7/10. Her recent knee surgery and history of pain were noted. The nurses notes stated that Plaintiff was transported via wheelchair and placed in ED bed #1 but "pt got up off cot, (could not walk earlier), and left clinical area. Did not tell anyone why she was leaving, would not talk with triage nurse." (Tr. 221-222).

On August 14, 2006 Dr. Mitchell saw the Plaintiff again and noted that her motion in her knee was full and that she was walking well. There was still a problem with swelling and the Plaintiff complained it was difficult because she had to stand a lot on her job. Dr. Mitchell felt

---

[2] Hydrocodone is a semisynthetic narcotic analgesic and antitussive with multiple actions qualitatively similar to those of codeine.

that her weight was as much a problem with that as her knee.  Dr. Mitchell had no further plans for treatment and suggested that the Plaintiff transfer to a store where she could sit occasionally or loose some weight.  (Tr. 269).

On August 31, 2006 the Plaintiff presented to the NARMC for a sore throat and nausea.  She made no reference to he knee but stated that her pain level was 10/10.   The nursing assessment noted that the Plaintiff moved all extremities.  (Tr. 217-218).

On September 6, 2006 the Plaintiff presented to the NARMC because of "suicidal ideation" and stated that she was stressed at work and that she took ten Tylenol #3.  The Past Medical History noted that she has had no medical problems but that she had a recent left knee injury and arthoscopic surgery. (Tr. 213).  No cyanosis, clubbing, or edema was noted on the extremities. (Tr. 214).

On September 26, 2006 Plaintiff was seen by Dr. Mitchell who again encouraged her to find a sitting job or loose some weight.  He gave a 2% partial permanent impairment for the meniscectomy, left knee, according to the AMA Guides to the Evaluation of Permanent Impairment, Fourth Edition.  He did note that if she is not better in one month and chooses to return to regular duty her note will allow her to do so.  (Tr. 268).  The doctor's note was not part of the record. On this date the Plaintiff filed her application for disability. (Tr. 79-81, 84-86, 128).

On November 7, 2006  Dr. Alice M. Davidson reviewed the medical records and determined that the Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for a total of about 6 hours in an 8 hour work day; sit for a total of about 6 hours in an 8 hour work day and would not have difficulty with pushing or

pulling. (Tr. 279). Dr. Davidson found no postural limitations (Tr. 280), no manipulative or visual limitations (Tr. 281) and no communicative or environmental limitations. (Tr. 282).

A vocational expert, Dr. Sarah Moser, testified at the hearing that, based upon the RFC as stated by Dr. Davidson, the Plaintiff would be able to perform the job she was performing at the time of the injury. (Tr. 34-35).

On April 15, 2008 the Plaintiff was seen by Dr. Vann Smith who performed a neuropsychological evaluation on the Plaintiff. (Tr. 296-299). Upon examination, Dr. Smith reported that Plaintiff was oriented in all spheres, her memory was mildly impaired, her judgment and insight were intact; her thought processes were functional in quality; and her intelligence fell within the normal range (Tr. 297). Plaintiff reported to Dr. Smith that she took no antidepressants, and that she sustained a grade II and III concussion from a car accident (Tr. 296). Dr. Smith diagnosed Plaintiff with diffuse organic brain dysfunction of moderate severity and cognitive dysfunction (Tr. 298-299). Dr. Smith also completed a Mental Residual Functional Capacity Questionnaire at the request of Plaintiff's attorney and opined she was essentially unable to meet competitive standards with regard to unskilled work (Tr. 300-304).

Plaintiff now asserts that she is disabled as a result of a serious motor vehicle wreck that render her disabled by chronic pain, depression and difficulties maintaining employment. (Doc. 8, p. 1) and that the ALJ committed error; (A) because his decision was not supported by substantial evidence, (B) he failed to develop the record, and (C) when he found that the Plaintiff did not have severe mental impairments. (Doc. 8, p. 12-23).

**IV.    Discussion**:

Of particular concern to the court is the RFC assessment made by the ALJ which was

based upon a consulting physician's assessment.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "Under this step, the ALJ is required to set forth specifically a claimant's limitations and to determine how those limitations affect her RFC." *Id*.

The only medical assessment in the file was prepared by a non-examining, consultative doctor who determined that the Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for a total of about 6 hours in an 8 hour work day; sit for a total of about 6 hours in an 8 hour work day and would not have difficulty with pushing or pulling. (Tr. 279). Dr. Davidson found no postural limitations (Tr. 280), no manipulative or visual limitations (Tr. 281) and no communicative or environmental limitations.

(Tr. 282). *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence).

On Plaintiff's alleged onset date of disability, February 13, 2006, she sought treatment at North Arkansas Regional Medical Center emergency room (ER) after she fell at work (Tr. 231-241). Plaintiff complained of pain in her left knee and left ankle, but x-rays of both her knee and ankle were normal (Tr. 236). Plaintiff followed up with her physician, Dr. Sammy Scroggins, who ordered a magnetic resonance imaging (MRI) of Plaintiff's left knee on March 7, 2006 (Tr. 189). Plaintiff presented for an orthopedic evaluation with Dr. Terry J. Sites on March 25, 2006 (Tr. 186). Dr. Sites's examination of Plaintiff's knee was normal and revealed a good straight leg raise, range of motion from 0-125 degrees, no real effusion or evident mass, and normal peripheral pulse, motor, and sensory exams (Tr. 186). Dr. Sites reviewed Plaintiff's MRI and noted, "we generally do not get too excited about popliteal cysts themselves, and rarely consider operative treatment directly on one." (Tr. 186). Dr. Sites prescribed only Naprosyn and physical therapy and released her to light work duty. (Tr. 186). Plaintiff returned to Dr. Sites on April 19, 2006 and reported that the Naprosyn helped with the swelling and pain in her left knee. (Tr. 185). Dr. Sites's examination revealed only mild patellofemoral crepitation and trace knee effusion. (Tr. 185).

Plaintiff presented to Dr. B. Raye Mitchell, Jr., an orthopaedist, on May 15, 2006 (Tr. 272). On examination, Dr. Mitchell noted that her popliteal cyst was not tender, and she had full range of motion (Tr. 272). He released her to light work, primarily sitting (Tr. 272). Despite his findings, Plaintiff requested that he scope her knee. (Tr. 272). Dr. Mitchell performed an

arthroscopy of Plaintiff's left knee on May 26, 2006, and it revealed a medial meniscus tear and surgery was performed. (Tr. 274-275). It is clear to the court that the medial meniscus tear that was discovered only because of the surgery was the result of the Plaintiff's pain.

It is clear that the surgery was successful and the Plaintiff was on her way to recovery because on June 1, 2006 the Plaintiff presented to the NARMC complaining of being dizzy. She listed her recent surgery but listed her pain level at 0/10. The physical exam noted that there was no extremity tenderness with a full range of motion in all extremities. There was no edema and the left knee was healing well with no evidence of infection. (Tr. 227-228).

When Plaintiff returned to Dr. Mitchell on June 7, 2006, her range of motion was good from full extension to 100 degrees of flexion and she was only a little sore (Tr. 271). Dr. Mitchell released her to return to work and noted, "I think she is doing great." (Tr. 271).

It appears that the Plaintiff did return to work because she presented to the emergency room on June 29, 2006, and reported that she re-injured her left knee after lifting a bucket at work. (Tr. 223). Pain and swelling were noted over the left anterior knee. (Tr. 225).

On July 12, 2006, Dr. Mitchell's examination revealed knee range of motion from 0-100 degrees, with a little bit of stiffness due to her keeping her knee extended, negative McMurray's test[3], non-tender joint lines, and no patellar instability (Tr. 270). Dr. Mitchell noted, "I think she just has a knee strain," and "I think this will improve with time" (Tr. 270). A treating physician's opinion regarding physical limitations is entitled to substantial weight. *See Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994). In this instance however the doctor's opinion was not clearly stated. It is clear that he performed some examination of the leg but, in

---

[3]The McMurray test is used to evaluate individuals for tears in the meniscus of the knee.

light of the fact that many physical examinations in the past had not disclosed the meniscus tear, it is surprising that any additional MRI or other objective test were not ordered.

Plaintiff presented to the ER again on August 5, 2006, and reported pain and swelling in her left knee (Tr. 195-202). The ER physician's examination of her left knee revealed only limited range of motion due to pain and mild effusion, and she was able to ambulate without assistance (Tr. 197).

On August 7, 2006 the Plaintiff presented to the NARMC complaining of headache and eye pain. She listed her pain level at 7/10. Her recent knee surgery and history of pain were noted. The nurses notes stated that Plaintiff was transported via wheelchair and placed in ED bed #1 but "pt got up off cot, (could not walk earlier), and left clinical area. Did not tell anyone why she was leaving, would not talk with triage nurse." (Tr. 221-222). The Plaintiff listed her current medication at the time as Ibuprofen 800 mg.

On August 14, 2006, Dr. Mitchell observed that Plaintiff was "walking well," she had full range of motion in her knee, and her swelling was down. (Tr. 269). The Plaintiff still complained of having to stand in one spot and Dr. Mitchell opined that was both a problem with her knee and her weight and that one of her options would be to loose some weight but he did not prescribe that as a course of treatment. Dr. Mitchell saw the Plaintiff again on September 26, 2006 because "she was still having problems with her knee." He states she has completed her care and [I]f she is not better in one month and she chooses to return to regular duty her note will allow her to do so." He also determined that there was a 2% partial permanent impairment because of the surgery on the left knee. (Tr. 268). Dr. Mitchell never gave an opinion that she was able to perform the work that she was performing prior to her injury.

No RFC assessment was obtained from Dr. Mitchell by either the Plaintiff's attorney or the ALJ. The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir.2004). That duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped. *See Smith v. Barnhart*, 435 F.3d 926, 930 (C.A.8 (Ark.),2006). The court believes such an issue was present here since the Plaintiff did re-injure her leg.

The Plaintiff's saw Dr. Vann A. Smith for a neuropsychodiagnostic evaluation on April 15, 2008 (Tr. 296-299). Upon examination, Dr. Smith reported that Plaintiff was oriented in all spheres, her memory was mildly impaired, her judgment and insight were intact; her thought processes were functional in quality; and her intelligence fell within the normal range (Tr. 297).

Plaintiff reported to Dr. Smith that she took no antidepressants, and that she sustained a grade II and III concussion from a car accident (Tr. 296). However, the only records regarding a car accident are dated January 2006 and specifically state, "no history to suggest head injury" (Tr. 243). Also, Plaintiff testified that she did not "see stars" after the accident and was not injured at all as a result of the accident (Tr. 32). Nevertheless, Dr. Smith diagnosed Plaintiff with diffuse organic brain dysfunction of moderate severity and cognitive dysfunction (Tr. 298-299). The court notes that Dr. Smith stated that the clinical history was from the patient and that medical records had been requested. (Tr. 296). Evidently Dr. Smith did not review or did not have the Plaintiff's medical records at the time he formulated his opinion. If he had he clearly would have determined that there was no history for closed head trauma as he determined.

The court also notes that the Disability Report completed by the Plaintiff on September

26, 2006 stated that she had no problem in understanding, coherency or concentrating and the only claimed reason for disability was in standing and walking. (Tr. 125).

Dr. Smith also completed a Mental Residual Functional Capacity Questionnaire and opined she was essentially unable to meet competitive standards with regard to unskilled work (Tr. 300-304).

The fact that the plaintiff did not allege mental impairment as a basis for her disability in her application for disability benefits is significant, even if the evidence of mental impairment was later developed. See *Smith v. Shalala*, 987 F.2d 1371, 1375 (8th Cir.1993); *Dunahoo v. Apfel*, 241, F. 3d 1033, 1039 (8th Cir. 2001). However, the evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996).

The ALJ assigned little weight to Dr. Smith's opinion because a consultative opinion generally does not satisfy the substantial evidence requirement, especially, as here, when the consultative physician is the only examining doctor contradicting a treating physician *(See Jenkins v. Apfel*, 196 F.3d 922,925 (8th Cir. 1999)) and the opinion was inconsistent with the medical record as a whole. *See Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir.2005).

Dr. Smith stated that the Plaintiff presented to him "with a history of steadily worsening neurocognitive/emotive symptoms including: 1) impaired recall memory, 2) word finding difficulty, 3) sleep pattern disturbance, 4) affective lability, 5) impaired attention to sequential detail, 6) impaired concentration, and 7) dysexuecutivism." Dr. Smith went on to state that her "medical history is significant for the above referenced neurocognitive symptoms. (Tr. 296).

The court has searched the medical records in the file and, with the exception of sleep

pattern disturbance, can find no evidence of these symptoms.  It is difficult to understand where Dr. Smith obtained this information unless it was from the Plaintiff, but, if so, it is not documented in the record before the court.

While Dr. Smith's opinion may be accorded little weight because it does not appear to be supported by the record the ALJ has a duty to fully and fairly develop the record.  *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made).  It is incumbent upon the ALJ to establish by medical evidence that the claimant has the requisite RFC.  If a treating physician has not issued an opinion which can be adequately related to the disability standard, the ALJ is obligated to address a precise inquiry to the physician so as to clarify the record.  *See Vaughn v. Heckler*, 741 F.2d 177, 179 (8th Cir. 1984).

In light of the purported suicide attempt by the Plaintiff and in light of Dr. Smith's opinion, it appears to the court that the Plaintiff's mental health was in issue sufficiently to justify an independent mental RFC evaluation.

The court believes that the ALJ did exclusively rely on a non-examining, non-treating physician. *See Nevland v. Apfel*, 204 F.3d 853 at 858 (relying upon non-examining, non-treating physicians to form an opinion on a claimant's RFC does not satisfy the ALJ's duty to fully and fairly develop the record). *See Dixon v. Barnhart*, 324 F. 3d 997 (2003). The treating physician's record shows only that he has determined that his treatment is concluded not any opinion on her ability to perform work.

Remand is necessary to allow the ALJ to develop the record further regarding plaintiff's RFC.  *See* 20 C.F.R. §404.944; *Brissette v. Heckler*, 730 F.2d 548 (8th Cir. 1984) (holding that

the ALJ is under the affirmative duty to fully and fairly develop the record).

## V.    Conclusion:

Based on the foregoing, the decision of the Commissioner is hereby reversed and this case is remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED this 13th day of January 2010.

　　　　　　　　　　　　　　　　　　　/s/ J. Marschewski
　　　　　　　　　　　　　　　　　　　HONORABLE JAMES R. MARSCHEWSKI
　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE